IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| LEMANDA K. SINGLETARY AND | § | CASE NO. 06-30339-H4-7 |
| JEFFREY L. SINGLETARY, | § | |
| | § | |
| DEBTORS | § | |
| | § | |

MEMORANDUM OPINION ON THE MOTION OF THE UNITED STATES TRUSTEE
TO DISMISS CHAPTER 7 CASE PURSUANT TO 11 U.S.C. § 707(b)(2)

## I. INTRODUCTION

LeManda and Jeffrey Singletary (the Debtors) filed a Chapter 7 petition on February 1, 2006 indicating that the presumption of abuse did not arise based on their belief that they had sufficient deductions to their current monthly income under 11 U.S.C. § 707(b)(2)(A)(iii)[1] for payments on secured debts. The United States Trustee (the UST) filed a motion to dismiss pursuant to § 707(b)(2) claiming that: (1) the Debtors should not be allowed to deduct payments on secured property that they intend to surrender; and (2) without those deductions, the presumption of abuse arises. Hence, the issue presented in this case is whether payments on secured debt may be deducted under § 707(b)(2)(A)(iii)(I) as being "scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition" when: (1) the collateral has been surrendered before the motion to dismiss was filed; or (2) the Debtors' Statement of Intention indicates that they will surrender the collateral. This is a matter of first impression before this Court.

---

[1] All section references are to 11 U.S.C. unless otherwise noted.

This Court holds that the mere act of declaring an intent to surrender collateral on a Statement of Intention does not extinguish the Debtors' right to deduct those payments under § 707(b)(2)(A)(iii). However, for purposes of a motion to dismiss based on the presumption of abuse formula found in § 707(b)(2)(A) (Presumption of Abuse Motion), the relevant date on which calculations should be based is the date of the filing of the motion, not the date of the filing of the petition. Therefore, any events occurring post-petition and up to the date of the filing of the motion must be taken into account in applying the means test. Thus, if a debtor has carried through with his intent to surrender the collateral and relief from stay has been granted before the filing of the Presumption of Abuse Motion,[2] the payments on that debt would not be counted under § 707(b)(2)(A)(iii).

## II. BACKGROUND OF AMENDED § 707(b)

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) became fully effective on October 17, 2005. One goal of the BAPCPA amendments was to regulate abuse in consumer bankruptcies. The abuse that concerned Congress was debtors receiving a full discharge under Chapter 7 when they had regular income that could be used to repay some portion of their unsecured debt in a Chapter 13 plan.[3] The principal method implemented to steer debtors away from

---

[2] The same result would occur under § 707(b)(2)(A)(iii) if the debtor claimed the property as exempt and then surrendered it because the asset would no longer be property of the estate. 11 U.S.C. § 522.

[3] "[BAPCPA] was intended to address what Congress perceived to be certain abuses of the bankruptcy process. Among the abuses identified by Congress was the easy access to chapter 7 liquidation proceedings by consumer debtors, who if required to file under chapter 13, could afford to pay some dividend to their unsecured creditors." *In re Hardacre*, 338 B.R. 718, 720 (Bankr. N.D. Tex. 2006) (citing 151 CONG. REC. S2459, 2469-70 (Mar. 10, 2005)). "The Bankruptcy Reform Act of 2005 asks the very fundamental question of whether repayment is possible by an individual. It is this simple: If repayment is possible, then he or she will be channeled into chapter 13 of the Bankruptcy Code which requires people to repay a portion of their debt as a precondition for limited debt cancellation. . . . This bill does this by providing for a means-tested way of steering people . . . who can repay a portion of their debts, away from chapter 7 bankruptcy . . . ." Eugene Wedoff, *Means Testing in the New 707(b)*, 79 AM. BANKR. L.J. 231 (2005) (quoting 151 CONG. REC. S1856, (Mar. 1, 2005) (statement of Sen. Grassley)).

Chapter 7 and into Chapter 13 is the new version of § 707. Colloquially referred to as the "means test," this nomenclature is both an oversimplification and somewhat of a misnomer. Section 707 presents not a single test, but rather a series of requirements with multiple opportunities for debtors to be pushed into Chapter 13. It is a misnomer in the sense that the "test" being conducted is not whether the debtor has means to pay, but rather whether the debtor has *no* means to pay. Therefore, the phrase "pass the means test" hereinafter means that a debtor will be allowed to stay in Chapter 7; and conversely, to "fail the means test" means that a debtor will face dismissal or conversion unless he is able to show "special circumstances." Exhibit A provides a simplified flow chart of the mechanics of § 707(b) and will be helpful to read in conjunction with the following description of the means test.

The pre-BAPCPA version of § 707(b) was largely retained in § 707(b)(1) with a few substantial alterations. The previous standard of § 707(b), whether "granting of relief would be a substantial abuse of provisions of this chapter," allowed for broad judicial discretion in determining whether a case should be dismissed. Congress dropped the "substantial" adjective, leaving just the issue of whether granting the debtor relief would be an "abuse." Subsections § 707(b)(2) and (3) provide two methods of determining whether or not there is abuse under (b)(1). However, in § 707(b)(7), Congress also created a threshold income test so that a large portion of debtors can be fast-tracked past the more complex calculations of the means test in (b)(2). Therefore, § 707(b)(7) provides the first "test" as follows:

> (A) No judge, United States trustee (or bankruptcy administrator, if any), trustee, or other party in interest may file a motion under paragraph (2) if the current monthly income of the debtor, including a veteran (as that term is defined in section 101 of title 38), and the debtor's spouse combined, as of the date of the order for relief when multiplied by 12, is equal to or less than—

(i) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

(ii) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

(iii) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $ 525 per month for each individual in excess of 4.

(B) In a case that is not a joint case, current monthly income of the debtor's spouse shall not be considered for purposes of subparagraph (A) if –

    (i)    (I) the debtor and the debtor's spouse are separated under applicable nonbankruptcy law; or

        (II) the debtor and the debtor's spouse are living separate and apart, other than for the purpose of evading subparagraph (A); and

    (ii) the debtor files a statement under penalty of perjury –

        (I) specifying that the debtor meets the requirement of subclause (I) or (II) of clause (i); and

        (II) disclosing the aggregate, or best estimate of the aggregate, amount of any cash or money payments received from the debtor's spouse attributed to the debtor's current monthly income.

Current monthly income (CMI) is a new term defined in § 101(10A), which states:

(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on–

    (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

    (ii) the date on which current income is determined by the court for purposes

4

of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

Thus, the first test of § 707(b) is to determine whether the debtor's annualized CMI is lower than the state median income for a household of the same size.  If the debtor's income is below the median, he is exempt from the presumption of abuse test in § 707(b)(2).  However, the median income exemption of § 707(b)(7) does not make a debtor completely immune from motions to dismiss or convert.  Even if the debtor's income is under the state median, he could still face a motion under § 707(b)(3).  Conversely, if the debtor's annualized CMI is greater than the state median income, then the debtor becomes subject to the income calculations of § 707(b)(2).

The previous § 707(b) presumption in favor of granting the debtor relief was turned upside down by the newly-enacted § 707(b)(2), the heart of the means test.  It creates a presumption of abuse under certain circumstances when a debtor's disposable income exceeds fixed amounts. Pursuant to Fed. R. Bankr. P. 1007(b)(4),[4] and in order to facilitate the execution of the means test calculations, Official Form B22A is completed by every debtor and filed along with his schedules. Form B22A is used by both the debtor and the United States Trustee in order to determine whether

---

[4] The Bankruptcy Court for the Southern District of Texas adopted the Interim Bankruptcy Rules in their entirety without change on October 5, 2005.  Bankr. S.D. Tex. General Order 2005-6.  Therefore, all references to the Federal Rules of Bankruptcy Procedure mean the Interim Rules as adopted by the Southern District of Texas.

the presumption of abuse arises. The debtor's CMI is reduced by the expenses allowed in § 707(b)(2)(A)(ii) - (iv) to determine how much of the debtor's monthly income remains available for creditors. The deduction at issue in this case is § 707(b)(2)(A)(iii)(I), which allows a deduction for the average monthly payment on secured debts for "all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition." A debtor passes this part of the means test by sufficiently reducing his CMI to under $100 or $167, depending on the amount of his unsecured debt.[5] Based on the formula described in § 707(b)(2)(A), if the debtor's disposable income is too great, a presumption of abuse will arise.

However, a debtor's "failure" on this part of the test is not an absolute bar to Chapter 7. Since "failing" this portion of the means test only creates a presumption, § 707(b)(2)(B) allows the debtor a chance to rebut the presumption of abuse by showing special circumstances as follows:

> (i) In any proceeding brought under this subsection, the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative.

> (ii) In order to establish special circumstances, the debtor shall be required to itemize each additional expense or adjustment of income and to provide–
> > (I) documentation for such expense or adjustment to income; and
> > (II) a detailed explanation of the special circumstances that make such

---

[5] The amount of $100 is derived by dividing $6,000 by 60 monthly payments. The amount of $167 is derived by dividing $10,000 by 60 monthly payments. These dollar amounts and the 60 month period are codified in 11 U.S.C. § 707(2)(A)(i) as follows:

In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of–

(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $ 6,000, whichever is greater; or
(II) $ 10,000.

expenses or adjustment to income necessary and reasonable.

(iii) The debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required.

(iv) The presumption of abuse may only be rebutted if the additional expenses or adjustments to income referred to in clause (i) cause the product of the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv) of subparagraph (A) when multiplied by 60 to be less than the lesser of–
    (I) 25 percent of the debtor's nonpriority unsecured claims, or $ 6,000, whichever is greater; or
    (II) $ 10,000.

If the debtor either does not attempt, or fails, to rebut the presumption by showing special circumstances, the case must be dismissed or converted. However, if the debtor has "passed" by either not invoking the presumption of abuse or successfully rebutting the presumption with a showing of special circumstances, further analysis may still be necessary. The debtor could still face a motion to dismiss under § 707(b)(3), which codifies two judicially created tests for substantial abuse under the old § 707(b). In determining whether there is abuse under (b)(1), the court is to consider the following:

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.[6]

11 U.S.C. § 707(b)(3).

---

[6] If the deadline for the UST to file a motion based on the presumption of abuse, as discussed *infra* at note 10, and the UST elects to file a motion under § 707(b)(3), the UST may include a means test calculation based on the circumstances on the date of the filing of the motion or any date in the future. In that case, the court would be able to consider this means test as relevant evidence under the totality of circumstances analysis of § 707(b)(3), but failing that means test would not have the same presumptive effect of shifting the evidentiary burden to the debtor.

In conclusion, there are three ways to pass the means tests of § 707(b) and thereby remain in Chapter 7:

(1) Have an annualized CMI that is below the state median income and pass the abuse tests of § 707(b)(3); or

(2) Exceed the median income, have sufficient expense deductions to avoid creating the presumption of abuse, and pass the abuse tests of § 707(b)(3); or

(3) Exceed the median income, have the presumption of abuse arise, rebut the presumption of abuse with special circumstances, and pass the abuse tests of § 707(b)(3).

Even though only one type of deduction is at issue in this case–§ 707(b)(2)(A)(iii)(I)– it is nearly impossible to discuss such a narrow issue without having a full understanding of the overall scheme of § 707(b).  Having thus summarized the means test,  the Court now turns to the  issue presented in this case: whether a debtor may, under the means test, deduct payments to secured creditors when they have stated an intent to surrender the collateral securing those debts.

The Court makes the following Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52 as incorporated into Federal Rule of Bankruptcy Procedure 7052.  To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such.  To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such.  The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

### III.  FINDINGS OF FACT

The principal facts of this case are not in dispute.  The parties only disagree on the legal issue: whether the Debtors are allowed to deduct payments to secured creditors when they have

stated their intention to surrender the collateral securing those debts.  The facts, as stipulated to or admitted by counsel of record, or as admitted in the briefs and filings, are as follows:

1.   On February 1, 2006, the Debtors filed for relief pursuant to Chapter 7 of the Bankruptcy Code.  [Docket No. 1.][7]

2.   On February 1, 2006, the Debtors filed a Statement of Intention which reflects their intent to surrender a 2004 GMC 3500 truck (the "Truck") and their home at 17311 Stone Peaks Drive, Houston, Texas, 77095 (the "Home").  [Docket No. 1.]

3.   On February 3, 2006, the Debtors filed a Statement of Current Monthly Income and Means Test Calculation (Form B22A).  [Docket No. 4.]  The Debtors have not filed an amended Form B22A.

4.   On line 42 of Form B22A, which allows for a deduction of future payments on secured claims, the Debtors listed a payment on the Truck of $647.67 and a mortgage payment on the House of $1,425.83.  With these deductions, the Debtors' Form B22A lists their monthly disposable income as a deficit of $308.49.  [Docket No. 4.]

5.   On March 7, 2006, the first meeting of creditors took place.  [Docket No. 9.]

6.   On March 17, 2006, in accordance with § 704(b)(1), the UST reviewed all materials filed by the Debtors and then filed the UST's Statement of Presumed Abuse.  [Docket No. 19.]

7.   On March 28, 2006, the Court granted GMAC's motion for relief from the automatic stay against the Truck.  [Docket No. 21.]

---

[7]  In this Memorandum Opinion, all references to docket numbers relate to the docket sheet in Case No. 06-30339, unless otherwise noted.

8.     On April 18, 2006, the UST filed its Motion to Dismiss Chapter 7 Case Pursuant to §
       707(b)(2). [Docket No. 24.]

9.     In calculating future payments on secured claims (Line 42 of Form B22A), the UST included
       only payments for the debts that the Debtors reaffirmed and not payments on secured
       property they had surrendered or intended to surrender. [Docket No. 24].

10.    On April 21, 2006, the Debtors filed their Response to UST's Motion to Dismiss. [Docket
       No. 25.]

11.    On May 12, 2006, the Debtors filed their Brief of Debtor on UST's Motion to Dismiss.
       [Docket No. 35.]

12.    On May 16, 2006, Stipulations between the United States Trustee and the Debtors were filed.
       [Docket No. 37.]  The only dispute between the parties is whether the Debtors are entitled
       to deduct payments of debts secured by property that the Debtors intend to surrender. *Id.*

13.    On June 23, 2006, the UST filed its Brief in Support of Motion to Dismiss Pursuant to §
       707(b)(2). [Docket No. 40.]

14.    On June 28, 2006, the Debtors filed their Brief on UST's Motion to Dismiss Pursuant to §
       707(b). [Docket No. 43.]

15.    On July 11, 2006, this Court held a hearing on the UST's Motion to Dismiss Pursuant to §
       707(b)(2).  Counsel presented arguments and admitted exhibits into evidence.

16.    The Debtors' annual income is $71,956.56 [Docket No. 4, Form B22A] and exceeds the
       median income in Texas for a household of five, which is $62,546.00. [Docket Nos. 4, Form
       B22A; 37, ¶ 12.]

17.     The Debtors' debts are primarily consumer debts.  [Docket No. 37, ¶ 6.]  The Debtors'

unsecured non-priority debt totals $136,336.57. [Docket No. 37, ¶ 6.]  The Debtors' secured

debt totals $176,382.00.  [Docket No. 1, Summary of Schedules.]

## IV.  CONCLUSIONS OF LAW

**A. The Debtors are above the median income for Texas, and therefore the means test of §
707(b)(2) applies**.

The Debtors are a married couple with three dependent children. [Docket No. 4, Form B22A,

Line 14].  For a family of five, the median income in the state of Texas is $62,546.00.[8]  The Debtors

annualized CMI is $71,956.56. [Docket No. 4, Form B22A, Line 13.][9]  Therefore, the Debtors do

not qualify under § 707(b)(7) for an exemption from the presumption of abuse test.  The next step

is to determine their disposable monthly income by deducting from their CMI the expenses allowed

in § 707(b)(2)(A)(ii) - (iv).

**B.  The means test is neither exclusively backward-looking, nor forward-looking, but a
combination of both.**

The main contention between the parties is not what debts should be counted under §

707(b)(2)(A)(iii), but rather *when* is the correct time to calculate deductions.  Based on the holding

in *In re Walker,* No. 05-15010, 2006 Bankr. LEXIS 845 (Bankr. N.D. Ga. 2006), the only published

---

[8]*See* Census Bureau Median Family Income By Family Size (in 2004 Inflation Adjusted Dollars), available at
http://www.usdoj.gov/ust/eo/bapcpa/20051017/bci_data/median_income_table.htm.

[9] The Debtor-husband had performed holiday seasonal work at the end of 2005 but was unemployed when the
petition was filed in February of 2006.  CMI is based on an average of the six-month period prior to the filing of the
bankruptcy petition; therefore, the Debtors' CMI is much greater than their actual present income.  The Debtors do not
dispute the calculation of their CMI and agree that the husband's unemployment is relevant only to their burden of
showing special circumstances should the presumption of abuse arise. [Docket No. 23.]

opinion to deal with this new section in the context of motion to dismiss a chapter 7 case, the Debtors argue that it is inconsistent to have a means test that uses the historical CMI and at the same time considers future expenses instead of past expenses. *In re Walker,* 2006 Bankr. LEXIS 845, at *16 ("The means test is a backward looking test, which is designed to measure the debtor's financial health at the time of the filing and to determine whether the debtor is in need of bankruptcy relief."). The Debtors would have this Court adopt a snapshot approach such that all debts "scheduled as contractually due" on the date of the petition should be included under § 707(b)(2)(A)(iii) without regard to any subsequent events. On the other hand, the UST argues that all post-petition events should be considered under the test for presumption of abuse based upon a recent Fifth Circuit decision interpreting the pre-BAPCPA version of § 707(b). *In re Cortez,* 457 F.3d 448 (5th Cir. 2006). Although the analysis in *Walker* is logical and presents an appealing policy position, this Court is obligated to follow the controlling precedent of *Cortez.*

The debtor in *Cortez* had been unemployed on the date of the filing of the petition but four days later found employment at an annual salary of $95,000. *Id.* at 451. Because this new job significantly changed the portion of unsecured debt that the debtor would be able to repay under a Chapter 13 plan, the United States Trustee filed a motion to dismiss for "substantial abuse" under the old version of § 707(b). The issue before the Fifth Circuit was "whether a bankruptcy court should consider post-petition events in deciding whether to dismiss a case for substantial abuse under § 707(b)." *Id.* at 450. The Fifth Circuit found that the language "the granting of relief" as used in § 707(b) referred to the entry of a discharge and not the imposition of the automatic stay from the commencement of a case. *Id.* at 455. Therefore, the Fifth Circuit held that "a court may act on the

12

basis of any development occurring before discharge is granted" and that "a substantial abuse determination is forward looking." *Id.*

Although *Cortez* dealt with the pre-BAPCPA version of § 707(b), the phrase "granting of relief" appears in the new § 707(b)(1), (2) and (3). Since § 707(b)(3) codifies two of the old tests for substantial abuse, and *Cortez* analyzed that substantial abuse standard, there should be no doubt that when a bankruptcy court is looking at a motion brought under § 707(b)(3), it is entitled to consider all post-petition events. However, this Court also believes that the use of the same phrase "granting of relief" means that a bankruptcy court may also look at post-petition facts when determining whether there is a presumption of abuse under the means test of § 707(b)(2)(A). To be sure, there must remain some distinction between these two standards, and there must be some limit on what can be used in the means test. The UST, or any other party in interest, may not rely on events which have not yet occurred, or which it believes may occur, as of the date of the filing of the Presumption of Abuse Motion. To allow a movant to include the outcome of future events as part of the means test would eliminate the distinction between the presumption of abuse test and the totality of the circumstances test. The constraints of § 707(b)(2)(A) apply equally to the UST and the Debtors. If the Debtors want to present facts that do not appear in the means test, they must argue these facts as special circumstances under § 707(b)(2)(B). Similarly, if the UST wishes to have the court consider facts external to the means test, it must make a motion under § 707(b)(3) based on the totality of the circumstances and will not receive the benefit of the presumption of abuse.

The Debtors, relying on *In re Walker*, believe that the means test is exclusively a threshold eligibility test. They argue that the filing of the petition freezes the time at which the means test may

13

be applied. Under their theory, if the presumption of abuse does not arise on the date of filing, it can never arise. While this position may be the most efficient from the point of view of the debtors' bar, it is not supported by a reading of the Code and the relevant Fifth Circuit case law. Rule 1017(e) was changed to reflect the new rules for filing Presumption of Abuse Motions. While Rule 1017 still controls the time during which a § 707(b)(1) or (3) motion must be filed, the time to file a Presumption of Abuse Motion under § 707(b)(2) is controlled by the new § 704(b), which provides:

> (1) With respect to a debtor who is an individual in a case under this chapter–
>
> > (A) the United States trustee (or the bankruptcy administrator, if any) shall review all materials filed by the debtor and, not later than 10 days after the date of the first meeting of creditors, file with the court a statement as to whether the debtor's case would be presumed to be an abuse under section 707(b); and
> >
> > (B) not later than 5 days after receiving a statement under subparagraph (A), the court shall provide a copy of the statement to all creditors.
>
> (2) The United States trustee (or bankruptcy administrator, if any) shall, not later than 30 days after the date of filing a statement under paragraph (1), either file a motion to dismiss or convert under section 707(b) or file a statement setting forth the reasons the United States trustee (or the bankruptcy administrator, if any) does not consider such a motion to be appropriate, if the United States trustee (or the bankruptcy administrator, if any) determines that the debtor's case should be presumed to be an abuse under section 707(b) and the product of the debtor's current monthly income, multiplied by 12 is not less than–
>
> > (A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner; or
> >
> > (B) in the case of a debtor in a household of 2 or more individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals.

11 U.S.C. § 704(b).

According to this section, the UST could file a motion up to 40 days after the § 341(a) meeting.[10] That fact, combined with the holding in *Cortez,* leads this Court to conclude that the Presumption of Abuse Motion may be based on a means test calculation that includes any changed circumstances in the Debtors' position between the filing of the petition and the filing of the motion to dismiss. In the case at bar, the UST filed its motion to dismiss on April 18, 2006. [Docket No. 24.] Therefore, to determine whether the presumption of abuse arises, the means test must be applied on that date. Having now determined when to calculate the means test, one issue remains: what payments can be deducted as "scheduled as contractually due" under § 707(b)(2)(A)(iii)?

## C. Under § 707(b)(2)(A)(iii), the Debtors should be allowed to include the payments on secured debts relating to assets which they intend to surrender in the future, but not the payments on secured debts relating to assets already surrendered as of the date the Presumption of Abuse Motion was filed.

The dispute between the parties in this case turns upon the meaning of the language "scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition." 11 U.S.C. § 707(b)(2)(A)(iii)(I). The Debtors argue that the sentence should be interpreted in a manner that "scheduled" means appearing only on the Debtors' schedules at the time of filing. The UST focuses on the end of the sentence, arguing that debts secured by assets that will be surrendered should not be included in the category of debts scheduled during the 60 post-petition months, and therefore payments on those debts should not be counted. In order to determine

---

[10] The 40 days is calculated as follows: (1) the UST has up to 10 days after the meeting of the creditors to file a statement setting forth whether the debtor's case would be presumed to be an abuse; (2) then, assuming the UST takes the entire 10 days to file this statement, the UST has up to another 30 days thereafter to file a Presumption of Abuse Motion.

the meaning of this language, the sentence needs to be parsed into its four parts, with each being analyzed separately and also in the context of the entire Code section.

The role of the judiciary is to interpret a statute "according to its terms." *United States v. Ron Pair Enters.*, 489 U.S. 235, 241, 109 S. Ct. 1026, 1030, 103 L. Ed. 2d 290, 298 (1989) (quoting *Caminett v. United States,* 242 U.S. 470, 485, 37 S. Ct. 192, 194, 61 L. Ed. 442, 452-53 (1917)). Therefore, a court must begin its analysis of a statute with the plain language. *Id.* (citing *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S. Ct. 2297, 2301, 85 L. Ed. 2d 692, 696-97 (1985)); *In re Walker,* 2006 Bankr. LEXIS 845, at *8-9 (citations omitted). When analyzing, "courts should strive to give operative meaning to every word in a statute." *Tesfamichael v. Gonzales,* 411 F.3d 169, 175 (5th Cir. 2005) (citing *Walters v. Metro. Educ. Enters., Inc.,* 519 U.S. 202, 209, 117 S. Ct. 660, 664, 136 L. Ed. 2d 644, 652 (1997)). Then, as long as the literal interpretation of the statute leads to a result equivalent to the drafters' intentions and "the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." *Ron Pair,* 489 U.S. at 241.

### 1. "Scheduled"

A major reason that the court in *Walker* was able to arrive at its decision was that it used a dictionary definition of the word "scheduled," and defined it for purposes of § 707(b)(2)(A)(iii) to mean "to plan for a certain date." *In re Walker,* 2006 Bankr. LEXIS 845, at *9. Although "scheduled" is not a statutorily-defined term, it is repeatedly given a specific meaning under the Code rather than the general meaning used in *Walker.* For example, part of a debtor's duties include the obligation to file a schedule of assets and liabilities and also a schedule of current income and expenditures. *See* 11 U.S.C. § 521(a)(1)(B)(i) and (ii). This same obligation also appears in Fed.

16

R. Bankr. P. 1007(b), which requires the debtor to use the Official Forms for these schedules and other documents.  Therefore, this Court interprets the word "scheduled" in § 707(b)(2)(A)(iii) to refer to a debt being listed on the Debtors' official schedules and not the common meaning used in *Walker*.

This Court is keenly aware of the Debtors' obligation to amend their schedules. *In re Cortez*, 457 F.3d 457-58.  This duty extends not only to changes in income, but also to changes in expenditures. *See*, Schedule J, Line 19 ("Describe any increase or decrease in expenditures reasonably anticipated to occur within the year following the filing of this document").  The UST is correct in interpreting "scheduled" to refer to whether a debt currently appears on the Debtors' schedule but goes too far in asserting that merely declaring an intent to surrender the collateral on a Statement of Intention is sufficient to make that debt no longer "scheduled" for purposes of § 707(b)(2)(A)(iii)(I).  If the only action taken by a debtor is to check the "surrender" box on the Statement of Intention, there is no reason that a debtor should be obligated to amend his schedules to reflect any change as to that debt.[11]  On the other hand, if the stay had been lifted and the collateral had been surrendered to the secured creditor, then the status of that debt should be updated on the debtor's schedule. *See* 11 U.S.C. § 506.

Drawing on the discussion above regarding the appropriate window to conduct a means test, the appropriate meaning of "scheduled" in the context of § 707(b)(2)(A)(iii) is whether the debt *should* appear on the Debtors' schedules as a secured claim on the date that the Presumption of

---

[11] As the title of the document suggests, a declaration made on the Statement of Intention is not immediately binding and does not mean that the collateral as already been surrendered. Rather, it is merely a declaration of an intent to surrender the collateral in the future which can be amended by the debtor for 30 days after the first meeting of creditors. Fed. R. Bankr. P. 1009(b); 11 U.S.C. § 521(a)(2)(B).

Abuse Motion was filed.  In the present case, on the date that the UST filed its motion to dismiss, the relief from stay had already been granted on the Truck, and it had been turned over to GMAC but no action had been taken on the House other than the assertion of an intent to surrender in the original Statement of Intention.  Accordingly, the Truck should no longer be scheduled as a secured debt because any claim for a deficiency would be unsecured.  Conversely, the House would still qualify as "scheduled" on that date.

### 2. "As contractually due"

"The common meaning of 'as contractually due' is that the debtor is legally obligated under the contract ... to make a payment in a certain amount, with a certain amount of interest, for a set number of months into the future." *In re Walker*, 2006 Bankr. LEXIS 845, at *9.  Putting together the first two pieces, the phrase "scheduled as contractually due" refers to debts that: (1) appear on the debtor's schedules as of the date of the Presumption of Abuse Motion; and (2) the debtor has a contractual obligation to continue paying in the future.  Again, the mere act of filing a petition does not terminate the contractual obligation on that debt.  Further, filing a Statement of Intention to surrender collateral does not in and of itself terminate the contractual obligation of the debtor.  Even surrendering the collateral of secured debts does not end the contractual relationship.

> "The surrender of the collateral does not change the fact that the payments are 'contractually due.'  When a debtor files the bankruptcy petition, the debtor is contractually due for payments on the outstanding secured debts for the length of the contract. The debtor's contractual liability for the debt is not eliminated upon the surrender of the collateral. At the earliest, it may be eliminated by the entry of the discharge. At the latest, the contractual obligation may never actually be eliminated, but instead, the creditor would merely be enjoined from collecting the debt from the debtor in personam. *See Hall v. National Gypsum, Inc.,* 105 F.3d 225 (5th Cir. 1997). In other words, nothing the debtor does or does not do changes the fact that scheduled payments remain contractually due."

*Id.* at *12-13.

In the present case, the debts on both the House and the Truck were still "contractually due" even though the debt secured by the Truck should no longer be "scheduled" as a secured debt. The phrase "scheduled as contractually due" defines what type of debt payments should be deducted under § 707(b)(2)(A)(iii) but is subject to the limitation in the latter part of the subsection, "to secured creditors in each month of the 60 months following the date of the petition."

### 3. "To secured creditors"

The first limitation is that the debt must be to a "secured creditor." The phrase "secured creditor" is no longer defined in the Code. Interestingly, this was a defined term under the Bankruptcy Act of 1898, which states: "'Secured creditor' shall include a creditor who has security for his debt upon the property of the bankrupt of a nature to be assignable under this Act, or who owns such a debt for which some indorser, surety, or other persons secondarily liable for the bankrupt has such security upon the bankrupt's assets." 11 U.S.C. § 1(28)(1898); *see also Ivanhoe Building & Loan Ass'n v. Orr*, 295 U.S. 243, 245 (1935). However, when the Code was enacted, this definition was replaced by two different sections. "Creditor" is defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10A). In order for that creditor to be a "secured creditor," its claim must qualify for secured status under § 506(a), which provides:

> (1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount

19

so subject to set off is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

(2) If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

11 U.S.C. § 506(a)

This Court agrees with *Walker* to the extent that a debtor's Statement of Intention to surrender collateral alone is not enough to prevent the creditor from being a secured creditor, particularly because a debtor has the right to amend that Statement of Intention to reaffirm or redeem the collateral within 30 days after the § 341(a) meeting, which can be extended by the court for cause. Fed. R. Bankr. P. 1009(b); 11 U.S.C. § 521(a)(2)(B); *See also In re Walker,* 2006 Bankr. LEXIS 845, at *13 (citing *In re Rodgers,* 273 B.R. 186, 192 (Bankr. C.D. Ill. 2002)). However, this Court disagrees with *Walker* in its assertion that there is no effect on the secured status of the creditor after the debtor surrenders the collateral. *Id.* at *13-14 (arguing that the creditor remains secured until the collateral is liquidated and proceeds are applied to the debt). The Code defines a claim as secured only "to the extent of the value of such creditor's interest in the estate's interest in such property." 11 U.S.C. §506(a)(1). Upon surrender of the collateral to the secured party, the estate no longer has any interest in the collateral and the creditor's only remaining claim for any deficiency is the unsecured. Article 9 of the Texas Business and Commercial Code supports this interpretation in §9.622, which deals with the effect of acceptance of collateral and provides:

(a) A secured party's acceptance of collateral in full or partial satisfaction of the obligation it secures:

(1) discharges the obligation to the extent consented to by the debtor;

(2) transfers to the secured party all of a debtor's rights in the collateral;

(3) discharges the security interest or agricultural lien that is the subject of the debtor's consent and any subordinate security interest or other subordinate lien; and

(4) terminates any other subordinate interest.

Tex. Bus. & Com. Code §9.622

According to this section of the UCC, the debtor no longer has any interest in the collateral after it has been accepted by the creditor. Since § 506 defines the secured creditor's interest by the estate's interest in the property, there would no longer be any secured claim. In conclusion, the filing of a Statement of Intention to surrender collateral does not change the secured creditor's status, but the actual surrender by the debtor and acceptance by the creditor does terminate the creditor's secured status for purposes of § 707(b)(2)(A)(iii). This is why, as discussed above in Section IV.C.2., the schedules of the Debtors in this case should be amended to reflect that the Truck is no longer a secured claim.

### 4. "In each month of the 60 months following the date of the petition"

The UST interprets this phrase to be a minimum limit. It asserts that there must be at least one month post-petition where the debt would be due. Since no payments will be made after the collateral is surrendered, the Debtors should not be allowed to deduct any payments for debts they intend to surrender. This argument again confuses the act of surrendering collateral with the mere election to surrender on the Statement of Intention. If a debtor simply indicates an intent to surrender but has not yet actually done so, that debt would still be due in the post-petition period. Rather than

a minimum limitation, this Court finds that this clause is more accurately a maximum limit.  This

was the position taken by the court in *Walker*, which stated:

> [T]he debtor may have a car loan with a remaining payment term of only two years,
> or a mortgage with a remaining payment term of twenty years. The debtor would
> include only the remaining twenty-four months of the car loan payments, but would
> add all sixty months of the mortgage payments in order to calculate the average
> monthly payment on secured debts.

*In re Walker,* 2006 Bankr. LEXIS 845, at *9-10.

Therefore, this Court concludes that, under § 707(b)(2)(A)(iii), the purpose of the phrase "in

each month of the 60 months following the date of the petition" is to limit the maximum allowable

deduction to the average over the five year post-petition period.  The payments must only be

"scheduled as contractually due" during any portion of the 60 months, but they do not need to be

actually paid.

### 5.   Limits in other subsections of § 707(b)(2)(A) do not apply to deductions for payments on secured debt

The UST attached to its supplemental filing of August 31, 2006 [Docket No. 45] an

unpublished case from the Eastern District of Missouri, *In re Skaggs* (Case No. 06-40457), which

presents the same facts and reaches the opposite result from *Walker*.  Beyond the obvious fact that

this is an unpublished opinion and has no precedential value, this Court is not persuaded by the

reasoning the court used in criticizing *Walker*.  This case dealt with the same problem of debtors

claiming deductions under § 707(b)(2)(A)(iii) for debts secured by collateral that their Statement of

Intention said they would surrender.

*Skaggs* reads § 707(b)(2)(A)(iii) as being somehow statutorily subordinated to the limits

contained in § 707(b)(2)(A)(ii)(I).  The decision focuses on the word "applicable" in "[t]he debtor's

monthly expenses shall be the debtor's *applicable* monthly expenses specified under the National Standards and Local Standards." (emphasis added). Using that basis, the court argues that if a debtor files a Statement of Intention to surrender secured property, the payments on that debt are no longer "applicable" and therefore may not be included in § 707(b)(2)(A)(iii). This position is untenable when reading the remainder of § 707(b)(2)(A)(ii)(I), which states, "[n]otwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts." The phrase "payments for debts" has been interpreted to refer to the payments for secured debts in § 707(b)(2)(A)(iii). *In re Hardacre*, 338 B.R. at 726-727. This interpretation is necessary to prevent a debtor from "double dipping"–taking a deduction of the IRS standards for mortgage and car payments in § 707(b)(2)(A)(ii) and also deducting the actual amounts being paid under § 707(b)(2)(A)(iii). *Id.* at 724-725. Therefore, the plain language of § 707(b)(2)(A)(ii)(I) contemplates that payments on secured debts should only be considered under § 707(b)(2)(A)(iii). Thus, since the "notwithstanding" sentence serves to remove secured debt payments from the purview of § 707(b)(2)(A)(ii)(I), it makes no sense that the limitation of "applicable" would carry over to § 707(b)(2)(A)(iii).

Likewise, the phrases "actual expenses" and "reasonably necessary" appear several times throughout § 707(b)(2)(A)(ii)(I) and (II), but there is no basis to impute those limiting terms into § 707(b)(2)(A)(iii)(I). Congress could have included language limiting deductions for secured payments as it did in other parts of this section, but the absence of such terms specifically appearing in § 707(b)(2)(A)(iii)(I) can only be interpreted to mean that Congress did not intend for there to be any limits. *Walker* addressed this same point in discussing the difference between § 707(b)(2)(A)(iii)(I) and (II), as follows:

If the intent were to permit only those payments that would actually be made in the post-petition period, Congress could have specified that the payments to be deducted are only those payments to be made on secured debts that the debtor intends to reaffirm. For example, the second clause of section 707(b)(2)(A)(iii) also permits the debtor to deduct from CMI payments that would be required in a Chapter 13 case to 'cure' and reinstate a secured debt through a Chapter 13 plan. This subsection limits such deductions only to those debts secured by collateral that is necessary for the debtor's support, such as a residence or a vehicle. Had Congress intended to limit the general deduction for secured debt payments to only those debts being reaffirmed or to those items of collateral necessary for the debtor's support during the post-petition period, it could have included similar language in the first clause of section 707(b)(2)(A)(iii). However, there are no such restrictions on the payments to be deducted under the former clause.

*In re Walker*, 2006 Bankr. LEXIS 845, at *11-12.

Therefore, the limits found in other subsections of § 707(b)(2)(A) do not apply to deductions for payments on secured debt.

**D. Without deducting the payments on the Truck, the presumption of abuse arises in this case.**

Having determined that, under § 707(b)(2)(A)(iii), the Debtors are entitled to deduct payments on their home mortgage, but not to deduct payments on the already surrendered Truck, this Court proceeds with a recalculation of the Debtors' means test as of the date of the filing of the Presumption of Abuse Motion; this recalculation is set forth below. The major difference between the Court's version of the means test and the UST's version [Docket No. 45, Exhibit A] is the inclusion of the Debtors' mortgage payments on lines 20B(b) and 42(d).[12] As Line 51 indicates, the Debtors' 60 month disposable income far exceeds the $10,000 limit in § 707(b)(2)(A)(i)(II).

---

[12] The UST also failed to include any amount for the Chapter 13 administrative expense on Line 45. The Court believes this omission to be a drafting oversight and not an assertion that the Debtors are not entitled to this deduction.

Therefore, the Debtors fail the means test, the presumption of abuse arises, and the UST's motion shall be granted.

## Hypothetical Form B22A for the Debtors

Part II.  Calculation of Monthly Income for § 707(b)(7) Exclusion[13]

| Line Number | Description | Amount |
|---|---|---|
| 3 | Gross Wages, etc. | $5,996.38 |
| 12 | Total CMI | $5,996.38 |

Part III.  Application of § 707(b)(7) Exclusion

| 13 | Annualized CMI | $71,956.56 |
|---|---|---|
| 14 | Median Family Income (5)[14] | $62,546.00[15] |

Part IV.  Calculation of Current Monthly Income for § 707(b)(2)

| 18 | CMI for § 707(b)(2) | $5,996.38 |
|---|---|---|

Part V.  Calculation of Deductions Allowed Under § 707(b)(2)

Subpart A: Deductions Under Standards of the IRS

| 19 | National Standards: food, clothing, etc | $1,773.00 |
|---|---|---|
| 20A | Local Standards: Housing and Utilities, non-mortgage | $495.00 |

---

[13] The section headings and line numbers in this chart correspond with Form B22A.

[14] The Debtors filed their petition on February 1, 2006 and are therefore subject to the 2004 IRS and Census information. The 2005 data applies only to cases filed after February 12, 2006.

[15] As discussed in Section IV.A, the Debtors annualized CMI exceeds the Texas median income and they are therefore subject to the means test in § 707(b)(2)(A).

| 20B | Local Standards: mortgage/rent expense<br><br>a. IRS Housing and Utilities  $966.00<br><br>b.  Average Monthly Payment for any debts secured by your home        ($1,425.83) | $0.00[16] |
|-----|--------------------------------------------------------|----------|
| 22 | Local Standards: Transportation, operation | $281.00 |
| 23 | Local Standards: Transportation, ownership/lease | $0.00 |
| 25 | Other Necessary Expenses: Taxes | $228.97 |
| 26 | Other Necessary Expenses: Mandatory Payroll deductions | $238.70 |
| 27 | Other Necessary Expenses: Life Insurance | $75.00 |
| 30 | Other Necessary Expenses: Childcare | $200.00 |
| 31 | Other Necessary Expenses: Health Care | $25.00 |
| 32 | Other Necessary Expenses: Telecommunications | $200.00 |
| 33 | Total Expenses under IRS standards | $3,516.67 |

Subpart B: Additional Expense Deductions under § 707(b)

| 34 | Health Insurance | $352.71 |
|-----|--------------------------------------------------------|----------|
| 38 | Education Expenses for dependent children less than 18 | $10.00 |
| 41 | Total of Subpart B | $362.71 |

Subpart C: Deductions for Debt Payment

---

[16] If the mortgage payments were not going to be allowed as deductions under § 707(b)(2)(A)(iii), this amount would be $966.00, the applicable IRS housing standard.

| 42 | Future payments on secured claims | $1,526.24 |
|----|----|----|
| | a. Conn's Credit Corp.          $17.73 | |
| | b. HSBC / Suzuki             $ 57.40 | |
| | c. Homeowners               $ 25.28 | |
| | d. Household Mortgage     $1,425.83 | |
| 45 | Chapter 13 Administrative Expense | $152.62 |
| 46 | Total deductions for debt payment | $1,678.86 |

Subpart D: Total Deductions

| 47 | Total of all deductions allowed (sum of lines 33, 41, and 46) | $ 5,558.24 |
|----|----|----|

Part VI.  Determination of § 707(b)(2) Presumption

| 48 | Amount from Line 18 (CMI) | $5,996.38 |
|----|----|----|
| 49 | Amount from Line 47 (total deductions) | $ 5,558.24 |
| 50 | Monthly disposable income | $ 438.14 |
| 51 | 60 month disposable income | $ 26,288.40 |

## V. Conclusion

The Debtors present a sympathetic argument as to why they are not the typical "abusive" debtor Congress had envisioned in enacting BAPCPA and imposing the new means test. "When the Debtors filed their petition, they recognized that they were unable to meet their existing financial obligations and, therefore, they sought relief under the Code. They made a financially responsible choice to surrender property they could not afford in order to ensure that they received the fresh start afforded by Chapter 7." *In re Walker*, 2006 Bankr. LEXIS 845, at *23.  Unfortunately for the

Debtors, this Court is unable to follow the *Walker* court's analysis of § 707(b)(2)(A)(iii).  The Fifth

Circuit's recent decision in *Cortez* requires this Court to consider post-petition events in any motion

brought under § 707(b).  In considering what are the allowable deductions under § 707(b)(2)(A)(iii),

this Court finds that the language "scheduled as contractually due to secured creditors in each month

of the 60 months following the date of the petition" does not include payments on debts for which

the collateral has already been surrendered, but does include payments on debts for the which the

Debtors have only stated an intention to surrender the collateral.  Calculating the Debtors' means test

as of the date that the Motion was filed, the Court finds that the presumption of abuse arises because

the Debtors' 60 month disposable income exceeds $10,000.

The Debtors filed a Declaration of Special Circumstances [Docket No. 23], but any alleged

special circumstances were not addressed at the hearing and no evidence has been presented to the

Court.  Therefore, there is not a sufficient basis for the Court to make a determination of special

circumstances pursuant to § 707(b)(2)(B).[17]  Accordingly, the UST's Motion to Dismiss Pursuant

to § 707(b) is granted.  The Debtors have 10 days from the entry of this Order to convert to Chapter

11 or 13; otherwise, the case will be automatically dismissed.  A separate order consistent with

this Memorandum Opinion will be entered on the docket.

Signed on this 19th day of October, 2006.

Jeff Bohm
U.S. Bankruptcy Judge

---

[17] The debtor is required by § 707(b)(2)(B) to establish the special circumstances by providing (I) documentation for such expense or adjustment to income; and (II) a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable.

28

# OVERVIEW OF AMENDED 11 U.S.C. § 707(b)



**§ 707(b)(1)**

If the debtor has primarily consumer debts, then the question is whether the granting of relief would be an abuse, which can be found under either (b)(2) or (3).

**§ 707(b)(7)**

Is the debtor's annualized CMI above or below the state median income for a household of that size?

**Above Median**
§ 707(b)(2)(a)(i)-(iv) – apply disposable income test

**Below Median**
Still subject to § 707(b)(3) - Is there bad faith or totality of the circumstances?

**"Fail"**
Presumption of abuse arises (The debtor attempts to rebut with special circumstances § 707(b)(2)(B))

**"Pass"**
Still subject to § 707(b)(3)

**Yes**
There is a finding of abuse (Dismiss or Convert)

**No**
The debtor stays in Chapter 7

**No Special Circumstances, or the debtor doesn't attempt to rebut the presumption**
There is a finding of abuse (Dismiss or Convert)

**Yes, Special Circumstances**
Presumption rebutted, but still subject to § 707(b)(3)